# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PATRICIA A. KNAPP, | |
| **Plaintiff,** | 4:14CV3154 |
| **vs.** | |
| KEVIN RUSER, in his official capacity, and UNIVERSITY OF NEBRASKA BOARD OF REGENTS, | MEMORANDUM AND ORDER |
| **Defendants.** | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Filing No. 34) filed by Defendants Board of Regents of the University of Nebraska ("BRUN") and Kevin Ruser ("Ruser"), in his official capacity (collectively "Defendants"). For the reasons discussed below, the Motion will be granted in part; Knapp's federal claims will be dismissed; and her state law claims will be remanded to state court.

## BACKGROUND

Plaintiff Patricia A. Knapp ("Knapp") is a licensed attorney who has been a member of the Nebraska Bar since 1985. (Filing No. 20 ¶ 3.) She worked for the University of Nebraska College of Law ("Law College") in its Civil Clinical Law Program ("Civil Clinic")[1] in a half-time position from 1999-2003 and 2006-2011. (Filing Nos. 20 ¶¶ 10–16; 41-1 ¶¶ 9–14.) In 2011, Knapp was hired to work full time as a "Temporary Lecturer" in the Civil Clinic and the University of Nebraska's Weibling Project for the Psychological Treatment and Study of Discrimination.[2] (Filing Nos. 20 ¶ 17 & 46; 36

---

[1] The Civil Clinic is a Law College program in which law students work with supervising attorneys on civil cases at various stages of litigation. (Filing No. 20 at ¶ 26.)

[2] Knapp's participation in the Weibling Project was partially funded by the University of Nebraska Foundation.. (Filing No. 35-1 ¶ 8.)

¶ 27; 37-1.) This position was designated a "Special Appointment"[3] per the BRUN's Bylaws ("Bylaws") and the Law College's Guidelines for the Evaluation of Faculty for Promotion and Continuous Appointment in the University of Nebraska College of Law ("Guidelines"). As such, Knapp was neither a member of the faculty nor eligible for tenure.[4] (Filing No. 36 ¶ 27.)

When Knapp met with the Dean of the Law College to discuss the position, she was told the salary would be $80,000. (Filing No. 20 ¶ 18.) Knapp told the Dean she believed such a salary was "low," and the Dean said she would attempt to augment the salary for the next academic year, possibly by designating Knapp's position a "professor of practice." (*Id.*) Knapp agreed to the offered salary with the understanding that the Dean would attempt to increase the salary in the future. (*Id.*)

In early August 2012, Knapp received a letter with terms and conditions for the following year's employment contract, specifying a salary that was unsatisfactory to Knapp.[5] (*Id.* ¶ 21.) Prior to that time, Knapp had not had any other conversations with the Law College's administration regarding her salary for the upcoming year. (*Id.*) After receiving her contract offer, she learned via the University of Nebraska's website that a recently-hired male faculty member in a tenure-track clinic position was earning a

---

[3] Knapp's position was so categorized because she was hired into the rank of "Temporary Lecturer" and her salary was paid in part by funds which the Law College did not control and could not expect to offer indefinitely. (Filing Nos. 35-1 ¶¶ 6–8; 35-2 at ECF 42.)

[4] According to the Bylaws, faculty positions include those with the academic rank of researcher and above, while the position of Lecturer is considered a "special appointment." (Filing No. 35-2 at ECF 24 & 42–43.) Only faculty members with the academic rank of "assistant professor" or above may become eligible for tenure. (*Id.* at ECF 42–43.)

[5] While the letter offered a salary of $60,000 for the nine months of the academic year, (Filing No. 37-1), there is a discrepancy in the parties' filings as to whether there was also the possibility Knapp would be paid $20,000 for instruction during the summer of 2013, as she had been paid in the summer of 2012. (*See* Filing Nos. 20 ¶ 18; 21 ¶ 7; 36 ¶ 9; 42 ¶ 17.) Because Knapp's filings indicate she would have found either amount unsatisfactorily low, the discrepancy is immaterial.

$106,000 salary.  (Filing Nos. 20 ¶ 23; 36 ¶ 23; 35-5 at ECF 1.)  On August 22, 2012, Knapp informed the Civil Clinic's Director, Kevin Ruser, that she believed the clinical programs at the Law College had a "gender equity problem" in regards to the payment of faculty and lecturers.  (Filing No. 20 ¶ 24.)  Although Knapp agreed to employment and salary terms for the next year, she alleges that the conversation ultimately became "heated."  (*Id.* ¶ 29.)

After this conversation, Knapp alleges Ruser ceased communicating with her adequately and began neglecting his duties in the Civil Clinic.  (*Id.* ¶¶ 30–33.) According to Knapp, the end result was that the Civil Clinic "was not fulfilling its ethical obligations to its clients or to its students."  (*Id.* ¶ 39.)  In the spring of 2013, Knapp learned that Ruser would be receiving a lifetime achievement award from the Law College.  (*Id.* ¶ 40.)  Ruser's alleged failure to inform Knapp that he would be receiving this award led Knapp to conclude that her relationship with Ruser was so fractured that they could not "work together as law partners in a way that would meet their ethical obligations to their clients and to their students."  (*Id.* ¶ 45.)

When the Dean of the Law College contacted Knapp to arrange a meeting to discuss plans for the upcoming 2013-14 academic year, Knapp initially refused to meet with the Dean, telling her "I will not meet with you . . . because there is nothing you could say that could convince me to be associated with Kevin Ruser."  (Filing Nos. 35-6 at 2; 36 ¶ 39.)  Despite her initial refusal, Knapp eventually did meet with the Dean. (Filing Nos. 20 ¶ 47; 36 ¶ 40.)  At the meeting, Knapp informed the Dean of several perceived problems in the Civil Clinic.  Many of the problems, according to Knapp, existed in the clinic beginning in the 1980s.  (Filing Nos. 20 ¶ 47; 36 ¶ 40.)

## STANDARD OF REVIEW

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint,* 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "Summary Judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *cert. denied*, 132 S. Ct. 513 (2011)) (internal quotations omitted). In reviewing a motion for summary judgment, the Court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (quoting *Torgerson*, 643 F.3d at 1042) (internal quotation marks omitted). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1042) (internal quotation marks omitted). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)) (internal quotations omitted).

## DISCUSSION

In her Amended Complaint (Filing No. 20) ("Amended Complaint"), Knapp presents ten claims against the Defendants. Six of her claims concern allegations of sex-based wage discrimination,[6] and the remaining four claims concern allegations of

---

[6] Knapp's first, second, fourth, fifth, sixth, and eighth claims are styled as disparate impact, disparate treatment, discriminatory wage practices, discrimination in violation of Nebraska's Fair Employment Practices Act, discrimination in violation of the Equal Pay Act of 1963, and discrimination in violation of Title VII of the Civil Rights Act of 1964.

retaliation.[7]  Before examining the merits of the claims, this Court must consider the question of sovereign immunity to determine if it has subject matter jurisdiction.

## I. Sovereign Immunity

Because Knapp seeks relief from the BRUN, an agency of the state of Nebraska,[8] and from a University faculty member acting in his official capacity,[9] this Court must first determine if any claims are barred by sovereign immunity.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984) ("A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment."); *Id.* ("[N]either pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment.").  *See also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669–70 (1999); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54 (1996)) ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States."); *Lors v. Dean*, 746 F.3d

---

[7] Knapp's third, seventh, ninth, and tenth claims are styled as constructive discharge, hostile work environment, violation of public policy, and retaliation.

[8] Both the Nebraska Supreme Court and the U.S. Court of Appeals for the Eighth Circuit have held that the BRUN and the University of Nebraska are state agencies with sovereign immunity under the Eleventh Amendment to the U.S. Constitution.  *See Doe v. Bd. of Regents of the Univ. of Neb.*, 788 N.W.2d 264, 281, n.51 (Neb. 2010); *Becker v. Univ. of Neb. at Omaha,* 191 F.3d 904, 908–09 (8th Cir. 1999); *see also Bd. of Regents of Univ. of Nebraska v. Dawes*, 370 F. Supp. 1190, 1193 (D. Neb. 1974) (concluding that Neb. Rev. Stat. § 85–105 does not grant the BRUN the power to waive immunity from suit in federal court).

[9] Because "[s]uits against persons in their official capacity are just another method of filing suit against the entity," the suit against Ruser is similarly subject to a sovereign immunity analysis. *Parrish v. Luckie*, 963 F.2d 201, 203 n.1 (8th Cir. 1992) (citing *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978)) ("A plaintiff seeking damages in an official-capacity suit is seeking a judgment against the entity.") (internal citations omitted).  Because Knapp seeks relief that is exclusively retrospective, the exception to the doctrine of sovereign immunity under *Ex Parte Young,* 209 U.S. 123 (1908), does not apply to her claims.  The *Young* exception never applies to the state itself or its agencies, regardless of the nature of the relief sought.  *Monroe v. Arkansas State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007) ("While under [*Ex Parte Young*] state officials may be sued in their official capacities for *prospective injunctive* relief without violating the Eleventh Amendment, the same doctrine does not extend to states or state agencies." (emphasis supplied)).

857, 861 (8th Cir. 2014) (quoting *Harmon Indus., Inc. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999) ("Sovereign immunity . . . is a jurisdictional threshold matter.").

Sovereign immunity bars any suit brought in federal court against a state or state agency, regardless of the nature of the relief sought, unless Congress has abrogated the states' immunity or a state has consented to suit or waived its immunity. *See Seminole Tribe*, 517 U.S. at 74; *Pennhurst State Sch.*, 465 U.S. at 100; *Edleman v. Jordan,* 415 U.S. 651, 663 (1974). A waiver of sovereign immunity by a state requires a "clear, unequivocal statement that it wishes to do so." *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 800 (8th Cir. 2002) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238–40 (1985)). The state's waiver controls not just whether it may be sued, but in which court a suit may be brought. *Id.* (citing *Atascadero State Hosp.*, 473 U.S. at 241). Thus, a state may consent to suit in state court without waiving its immunity in federal court. *Id.* (citing *Coll. Sav. Bank*, 527 U.S. at 676) (holding that a state statute waiving sovereign immunity in "any court of competent jurisdiction" was not sufficiently specific to waive the state's sovereign immunity to suit in federal court).

### a.    State-law Claims

Knapp's fourth claim asserts a discriminatory wage practice under Neb. Rev. Stat. § 48-1219. Her fifth and seventh claims assert violations of the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 to 48-1126 ("NFEPA").[10]    Her

---

[10]    In her Amended Complaint, Knapp does not specify upon what law her seventh claim is founded. (*See* Filing No. 20 ¶¶ 77–80.) While Defendants argue the claim is most logically examined under Title VII, Knapp cites to Neb. Rev. Stat. §§ 48-1104(1) and 48-1104(14) in her Brief in Opposition to Summary Judgment in support of Claim Seven. (*See* Filing No. 42 at 6.) Although Knapp admits that her seventh claim (for which she does not identify the relevant law) and her tenth claim (which will be considered under Title VII for reasons discussed later in this opinion) are essentially the same claim, (Filing No. 35-7 at 97:2–6), this Court will construe Claim Seven as arising under Nebraska Law because of Knapp's citation to Neb. Rev. Stat. §§ 48-1104(1) and 48-1104(14).

ninth claim asserts a public-policy violation under Nebraska Law. For reasons discussed below, the Court finds that it lacks jurisdiction to hear these state law claims due to the Defendants' sovereign immunity.

Nebraska law allows a plaintiff to sue the state for violations of both the NFEPA and Neb. Rev. Stat. § 48-1221 "in the same manner as provided by [Nebraska law] for suits against other employers." Neb. Rev. Stat. §§ 48-1126 and 48-1227.01. For violations of the NFEPA, "[a] complainant who has suffered . . . a violation of [the NFEPA] may . . . file an action directly in the district court of the county where such alleged violation occurred." Neb. Rev. Stat. § 48-1119(4). For violations of Neb. Rev. Stat. § 48-1221, an "[a]ction may be maintained in any court of competent jurisdiction." Neb. Rev. Stat. § 48-1223(2).

Neither of these remedial statutory schemes is sufficiently explicit to effect a waiver of sovereign immunity to suit in federal court. This Court has previously held that Nebraska has not waived immunity to suit in federal court under the NFEPA. *See Schreiber v. Nebraska*, 8:05-cv-537, 2006 WL 488719 (D. Neb. Feb. 28, 2006); *Wright v. Nebraska Health and Human Services System*, 8:04-cv-265, 2005 WL 1331158 (D. Neb. Feb. 14, 2005). Similarly, the language of Neb. Rev. Stat. §§ 48-1223(2) and 48-1227.01, when read in combination, is the precise type of statutory language the Eighth Circuit Court of Appeals has found insufficient to waive a state's sovereign immunity in federal court. *See Faibisch*, 304 F.3d at 800. Therefore, Knapp's fourth, fifth, and seventh claims are barred by sovereign immunity.

Knapp also asserts a claim for "Public Policy Based Retaliation" as her ninth claim for relief. (Filing No. 20 at 16.) She argues that Nebraska case law recognizes a

"tort-based claim for retaliation when it violates public policy." (Filing No. 42 ¶ 73 (citing *Trosper v. Bag 'N Save*, 734 N.W.2d 704, 706–07 (Neb. 2007)). Although Knapp asserts that her state law claims are authorized pursuant to Neb. Rev. Stat. §§ 48-1120.01 and 48-1223, these statutory waivers of sovereign immunity lack a clear, unequivocal waiver as applied to her claim of a violation of public policy.

Thus, Knapp's state law claims against the BRUN and Ruser are barred by sovereign immunity and this Court lacks subject matter jurisdiction to adjudicate them. Accordingly, Claims Four, Five, Seven, and Nine will be remanded to the District Court of Lancaster County.

### b.     Federal Law Claims

Knapp also asserts six claims under federal law. Five of these claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") (Claims One, Two, Three, Eight, and Ten). The remaining claim arises under the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") (Claim Six). The Eighth Circuit Court of Appeals has held that Congress, pursuant to Section 5 of the Fourteenth Amendment, abrogated states' sovereign immunity for claims under Title VII. *See Lors*, 746 F.3d at 860 n.4 (citing *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 729–30 (2003)). Similarly, the Eighth Circuit has held that Congress validly abrogated state sovereign immunity for suits under the EPA. S*ee O'Sullivan v. Minnesota*, 191 F.3d 965, 967 (8th Cir. 1999). Therefore, this Court will examine Knapp's federal claims on their merits.

**II. Sex-based Wage Discrimination**

Knapp's first, second, sixth, and eighth claims assert sex-based wage discrimination by the Law College. Essentially, she contends that she was paid less than male employees and not offered a tenure-track position.

  **a.  Claim One: Disparate Impact**

In her Amended Complaint, Knapp claims that the Law College "hire[d] female lawyer instructors . . . in non-tenured positions, while male instructors hired for identical positions received tenure positions." (Filing No. 20 ¶ 56.) "To establish a prima facie case of disparate impact under [Title VII], [plaintiff] must show: '(1) an identifiable, facially-neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two.'" *Bennett v. Nucor Corp.*, 656 F.3d 802, 817 (8th Cir. 2011) (quoting *Mems v. City of St. Paul*, 224 F.3d 735, 740 (8th Cir. 2000)), *cert. denied*, 132 S. Ct. 1807 (2012).

Here, Knapp has not alleged the existence of any facially-neutral employment policy to establish her prima facie case. Rather, the only employment practice Knapp identifies is that "Defendant University hires female lawyer instructors in the civil clinic in non-tenured positions while male instructors hired for identical positions received tenure positions." (Filing No. 20 ¶ 56.) Such an alleged practice is not facially neutral. Essentially, Knapp is arguing that the University refused to hire women in the Civil Clinic for tenured positions. (Filing No. 42 ¶ 52 ("Plainly, female supervising attorneys do not get tenure track positions while male supervising attorneys are given tenure track

positions.").) [11]  Knapp does not identify any facially-neutral policy or practice that has a disparate effect on a protected class.  Thus, she has not pled a prima facie case for disparate impact and her claim will be dismissed.

**b.     Claims Two, Six and Eight: Disparate Treatment and Discrimination Under Title VII and Wage Discrimination Under the Equal Pay Act**

Knapp next claims that the University "intentionally discriminated against her on the basis of sex."  (Filing No. 20 ¶ 60.)  In characterizing the alleged discrimination, Knapp claims that she "suffered an adverse employment action by receiving lower pay than all the male supervising attorneys in the clinical programs and not getting a tenure-track position while others did."  (*See* Filing No. 42 ¶ 56.)  Although Knapp argues her Title VII claims as if it were a matter of the Law College failing to promote her and paying her less than male colleagues, the uncontroverted evidence is that Knapp could only become eligible for tenure if she were hired into a tenure-eligible position.  (*See* Filing No. 35-3 at 5 (stating that the possibility of promotion to tenure does not apply to any positions in the Law College's clinical programs other than those with the rank of Assistant Professor, Associate Professor, or Professor).)  Per the Guidelines, there was no method by which her position as Lecturer could be transmogrified after a period of

---

[11]  This is not an allegation of disparate impact, but rather disparate treatment, a claim Knapp separately alleges in her Amended Complaint. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) ("[The U.S. Supreme Court] has consistently recognized a distinction between claims of discrimination based on disparate treatment and claims of discrimination based on disparate impact.  [Under disparate treatment,] [t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or [other protected characteristic]. . . .  By contrast, disparate-impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." (quoting *Teamsters v. United States*, 431 U.S. 324, 335–36, & n.15 (1977) (internal quotation marks omitted)); *Cartwright v. State*, 837 N.W.2d 521, 527 (Neb. 2013) ("Title VII prohibits both intentional discrimination, known as disparate treatment, as well as practices that, although they are not intentional discrimination, have a disproportionately adverse effect on minorities, which is known as disparate impact.") (citing *Ricci v. DeStefano*, 557 U.S. 557 (2009)).

time into a tenure-eligible position. Because Knapp argues her second and eighth claims as a failure to promote and wage discrimination, yet presents evidence more consistent with a failure to hire, the Court will examine her claim's merits in both contexts.

Absent direct evidence of discrimination, a plaintiff asserting disparate treatment and discrimination under Title VII on the basis of sex must meet the elements of the *McDonnell-Douglas* framework in order to create an inference of discrimination. Such an inference shifts the burden to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Young v. Builders Steel Co.*, 754 F.3d 573, 577–78 (8th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680–81 (8th Cir. 2012)).

To plead a Title VII prima facie claim alleging a failure to promote or wage discrimination, a plaintiff must plead that "(1) [s]he is a member of a protected class, (2) [s]he met [her] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)." *Young*, 754 F.3d at 577 (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853–54 (8th Cir. 2014) (internal quotation marks omitted)). A prima facie EPA wage discrimination claim is sufficiently similar to this framework that Knapp's Sixth Claim may be examined here as well.[12]

---

[12] In order to prevail on a claim under the EPA, "[a] plaintiff must first establish a prima facie case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (citing *Hutchins v. Int'l Bhd. of Teamsters*, 177 F.3d 1076, 1080 (8th Cir. 1999)); *see also Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 130 (7th Cir. 1989) (citing *County*

In order prevail under both Title VII and the EPA, Knapp must identify similarly situated males who were treated differently from Knapp.  *See Bennett*, 656 F.3d at 819 ("To create an inference of racial discrimination based on disparate treatment of fellow employees, the plaintiffs must show that they were treated differently than similarly situated persons who are not members of the protected class."); *Price*, 664 F.3d at 1191.  "The test to determine whether individuals are similarly situated is rigorous and requires that the other employees be similarly situated in all relevant respects before the plaintiff can introduce evidence comparing herself to the other employees."  *Bennett*, 656 F.3d at 819 (quoting *Chism v. Curtner*, 619 F.3d 979, 984 (8th Cir. 2010)) (internal quotation marks omitted).  Although this standard is rigorous, the "similarly situated co-worker inquiry is a search for a substantially similar employee, not for a clone."  *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (quoting *Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908, 916 (7th Cir. 2010) (internal quotation marks omitted)).

Construing all facts in a light most favorable to Knapp, her claim  falters because she has not shown any similarly situated male comparators who were treated differently.  Thus, she cannot establish an inference of discrimination.  By Knapp's own admission, all the individuals whom she identifies as comparators performed work or held duties that differed substantially from her own as a Temporary Lecturer in the Civil Clinic.  (Filing No. 35-7 at 87:8–90:9.)  The comparators were engaged in directing clinical programs at the Law College and were required to undertake academic research

---

*of Washington v. Gunther*, 452 U.S. 161, 178–80 (1981) ("Title VII's wage coverage is broader than that of the Equal Pay Act.").

and service as part of their positions' requirements. None of these expectations applied to Knapp's position as a Temporary Lecturer, which focused solely on teaching.[13]

Knapp argues that her job duties were substantially similar to her comparators because she performed "research" similar to that required of several of her proffered comparators. However, Knapp has admitted that the research required of her comparators was distinct from her work she labels "research" in her brief opposing summary judgment. (Filing No. 35-7 at 87:18–88:2 ("[Knapp]: The difference [between tenure-track and non-tenured positions] primarily related to the tenure-track faculty members need to spend approximately 20% of their time on research and writing and 20% of their time doing community service . . . . [W]hat I was doing was 100 percent teaching.").) As such, Knapp has not alleged sufficient evidence of comparable individuals to make a prima facie inference of discrimination under Title VII or the EPA.

Knapp's Title VII claims (Claims Two and Eight) similarly fail when examined as a failure to hire.[14] In order to establish a prima facie inference of discriminatory failure to hire, a plaintiff must plead that "(1) [plaintiff] belongs to a protected class; (2) [plaintiff] applied and was qualified for a job for which [defendant] was seeking applicants; (3) [defendant] rejected [plaintiff]; and (4) after rejecting [plaintiff], [defendant] continued to seek applicants with his qualifications." *E.E.O.C. v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1087 (8th Cir. 2014) (citing *Hunter v. United Parcel Serv., Inc.*, 697 F.3d 697, 703

---

[13] Although Knapp denies having ever seen a description of her position during her employment, (Filing No. 35-7 at 83:11), she acknowledges that the position's listing for 2013-2014 following her resignation accurately described the job she performed for 2012-2013. (*Id.* at 83:12–21.) This listing states that the position "carries no expectation of scholarship and a minimal expectation of engaging in public service or outreach." (*Id.* at ECF 154.)

[14] Knapp's allegations cannot support her EPA claim when examined as a failure to hire or failure to promote. *See Schnellbaecher*, 887 F.2d at 130 ("[Plaintiff's promotion discrimination claim] is beyond the scope of the [EPA].")

14

(8th Cir. 2012)).  Knapp does not allege that she applied for any tenure-eligible position.  Rather, from the initial full-time employment offer in 2011, Knapp was aware that her position did not carry the possibility of tenure.[15]  (*See* Filing No. 37-1 (offering Knapp a "special appointment as a Temporary Lecturer" in a "non-tenure leading" position).)

Nowhere does Knapp allege that the Dean of the Law College made any assertion that the Lecturer position could ever become eligible for tenure, even when the Dean indicated she would attempt to secure a larger salary for Knapp for the 2012-2013 year.  On the contrary, the uncontroverted evidence is that Knapp and the Law College mutually understood at all times that Knapp's position was not eligible for tenure and that no amount of time spent in the position would accrue towards tenure.

In her brief opposing summary judgment, Knapp acknowledges that the Law College has adopted the Guidelines but that they "[do] not appear to have been implemented in Plaintiff's case" because she "worked for many years yet male supervising attorneys received better compensation, better job opportunities, and tenure track positions."  (Filing No. 42 ¶ 28.)  Nowhere does Knapp allege how nine years of non-continuous, half-time employment entitles her under Title VII to have her position changed into one which was eligible for tenure, particularly as the evidence shows there

---

[15]  Knapp argues that the solution to this disparate treatment would be for the Law College to institute a policy that requires all attorneys in the Clinical Programs at the Law College to be considered for tenure after one year of employment.  (Filing No. 42 ¶ 52.)  Such a judicial mandate is beyond the requirements of Title VII or the Equal Pay Act.  *See Torgerson*, 643 F.3d at 1045. ("[Title VII] does not require the employer to restructure his employment practices to maximize the number of minorities and women hired." (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)) (internal quotation marks omitted)).

was no method for such a transformation under the BRUN's Bylaws and the Law College's own Guidelines.[16]

The uncontroverted evidence before the Court demonstrates that Knapp held a position with substantially different duties from her male colleagues, and she never applied for a position similar to those they held. As such, Knapp has failed to allege facts sufficient for a reasonable jury to find that she suffered less favorable treatment than the Defendants gave to similarly situated individuals outside of her protected class. For this reason, Knapp's first, second, sixth and eighth claims will be dismissed.

## III. Employment Retaliation Claims

Knapp also makes claims for constructive discharge (Claim Three) and retaliation (Claim Ten) arising under Title VII. For the reasons stated below, Knapp has failed to plead a prima facie case for either.

### a.    Claim Three: Constructive Discharge

Knapp asserts a claim for constructive discharge under Title VII.[17] "To prove constructive discharge, a plaintiff must demonstrate that: '(1) a reasonable person in her situation would find the working conditions intolerable and (2) the employer . . . intended to force the employee to quit.'" *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d

---

[16] Knapp argues in her Brief Opposing Summary Judgment that her situation is comparable to Steve Schmidt, the director of the Law College's Criminal Clinical Program. (Filing No. 42 ¶ 57.) Although Schmidt was in a tenure-track position by 2007, which was a year after being hired into a non-tenure position, Knapp does not allege sufficient facts to meet her initial burden. (Filing Nos. 41-2 at 1–3; 42 ¶¶ 24–25.) Knapp does not provide any information regarding the circumstances under which Schmidt was hired for his tenure-ineligible and tenure-track positions nor how his circumstances are comparable to her own. As such, she has not alleged "specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011.

[17] Knapp's Amended Complaint does not specify the legal basis for her claim for constructive discharge. (*See* Filing No. 20 ¶¶ 62–66.) This Court construes the claim as one arising under Title VII because Knapp cites to a Title VII case before the Nebraska Supreme Court in her Brief in Opposition to Summary Judgment. (*See* Filing No. 42 at 5 (citing *Gavin v. Rogers Technical Services, Inc.*, 755 N.W.2d 47, 54 (Neb. 2008)).)

1139, 1144 (8th Cir. 2007) (quoting *Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 960 (8th Cir. 2005)).  "If the plaintiff cannot show that the employer intended to force her to quit, she can still prevail if 'the employer . . . could have reasonably foreseen that the employee would [quit] as a result of its actions.'"  *Id.* (quoting *Wright v. Rolette County*, 417 F.3d 879, 886 (8th Cir. 2005)).

In other words, Knapp must show that she "'subjectively perceive[d] the environment to be abusive' and that 'a reasonable person would have found the conditions of employment intolerable and that [Defendants] either intended to force [her] to resign or could have reasonably foreseen that [she] would do so as a result of [their] actions.'"  *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1087 (8th Cir. 2010) (quoting *Fenney v. Dakota, Minn. & E. R.R.*, 327 F.3d 707, 717 (8th Cir. 2003)), *abrogated on other grounds by Torgerson*, 643 F.3d 1042–43.  "To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly.  If an employee quits without giving her employer a reasonable chance to work out a problem, then she has not been constructively discharged."  *Coffman v. Tracker Marine*, L.P., 141 F.3d 1241, 1247 (8th Cir. 1998) (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 & 496 (8th Cir. 1996)) (internal quotation marks and citations omitted).  "This is a 'substantial' burden as the 'bar is quite high' in these cases.  *Smith*, 625 F.3d at 1087 (quoting *O'Brien v. Dep't of Agriculture*, 532 F.3d 805, 810 (8th Cir. 2008)), *abrogated on other grounds by Torgerson*, 643 F.3d 1042–43.

Knapp's constructive discharge claim fails for two reasons.  First, she has not alleged facts sufficient for a ury to conclude that a "reasonable person would have found the conditions of employment intolerable."  Knapp implies that Ruser ceased

communicating with her.in retaliation for her allegations of pay discrimination.  Her evidence that Ruser communicated with her less frequently does not, in and of itself, create a cognizable constructive discharge claim.  Knapp admits that this lack of communication did not interfere with her own duties (*see* Filing No. 35-7 at 27:3–15), and the evidence shows the two maintained a work-related dialogue, even if was not with Knapp's preferred level of frequency or collegiality.  (*See, e.g.*, Filing Nos. 20 ¶ 39; 35-6; 35-7). Knapp further alleges that Ruser began to neglect *his own* cases in the Civil Clinic, thus somehow imperiling Knapp's ethical obligations.  However, Knapp's bare assertion that the Civil Clinic was a "de facto law firm" in which she was a partner and her citation to Nebraska Rule of Professional Conduct § 3-501.1(a)[18] is insufficient to create a triable issue of fact.  Knapp's Amended Complaint states that the event triggering Knapp's decision to resign was an affront she perceived from Ruser that was exclusively personal and had nothing to do with her or his professional obligations. (Filing No. 20 ¶¶ 40–45.)  There is simply no evidence of how Ruser's work on his own cases could affect Knapp so severely as to compel a reasonable person in her position to resign.  *See Higgins v. Gonzales*, 481 F.3d 578, 591 (8th Cir. 2007) ("[Plaintiff] cannot make her claim based on personality conflicts, bad manners, or petty slights and snubs."), *abrogated on other grounds by Torgerson*, 643 F.3d 1042–43.

Second, Knapp failed to provide the Law College a reasonable opportunity to correct the situation.  The evidence indicates that Knapp communicated her resignation

---

[18]    Nebraska Rule of Professional Conduct § 3-501.1(a) requires lawyers with managerial authority in firms and legal service organizations to make reasonable efforts "to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct."  *See* Neb. Ct. R. of Prof. Cond. § 3-501.1(a); Neb. Ct. R. of Prof. Cond. § 3-501.1 comment [1].

to the Dean before affording any opportunity for corrective action. Knapp initially refused to meet with the Dean to discuss future employment. (*See* Filing No. 35-6 at ECF 2.) When Knapp did meet with the Dean, the record indicates that Knapp centered her comments on perceived gender insensitivity within the Civil Clinic that had been on-going from her time there as a student in the 1980s. Knapp does not allege that she addressed the ethical conundrum she describes in her Brief Opposing Summary Judgement, although she discussed her communication breakdown with Ruser. (*See* Filing Nos. 20 ¶ 47; 35-7 at 73:20–24.)

For these reasons, Knapp has not presented a prima facie case of constructive discharge, and that claim will be dismissed.

### b.    Claim Ten: Employment Retaliation

Knapp asserts a claim for employment retaliation apparently arising under Title VII.[19] In order to establish a prima facie case for employment retaliation, a plaintiff must establish that (1) she engaged in conduct that a reasonable person could believe was protected conduct under Title VII,[20] (2) she suffered a materially adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse action. *Helton v. Southland Racing Corp.*, 600 F.3d 410, 416 (8th Cir. 2010). A materially adverse employment action occurs when there is "a tangible change in

---

[19] Knapp's Amended Complaint does not articulate the legal basis underlying her Tenth Claim. To support the claim, Knapp cited a Nebraska case in her Brief in Opposition to Summary Judgment which adjudicated a public policy retaliation issue. (*See* Filing No. 42 at 7 (citing *O'Brien v. Bellevue Public Schools*, 856 N.W.2d 731, 741 (Neb. 2014)). This case itself cites to an earlier case, which Knapp relies on to support her ninth claim for public policy based retaliation. (See Filing No. 42 at 7 (citing *Trosper v. Bag 'N Save*, 734 N.W.2d 704, 706–07 (Neb. 2007)); *O'Brien*, 856 N.W.2d at 741 (citing *Trosper*). While these citations indicate a claim for public policy based retaliation, such a claim would be entirely redundant with Claim Nine, and the claim would be barred by sovereign immunity. As such, this Court will construe Claim Ten as arising under Title VII.

[20] That this first element is met in this case is not disputed by the parties. (*See* Filing No. 36 at ECF 29.)

working conditions that produces a material employment disadvantage." *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015) (quoting *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 926 (8th Cir.2007)) (internal quotation marks omitted). This includes "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects," but does not include "[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage." *Id.* at 766–67.

For the same reasons Knapp failed to present a viable claim of constructive discharge, she also has failed to present any genuine issue of material fact as to whether she suffered a materially adverse employment action, *i.e.*, a reasonable jury could not conclude that Ruser's alleged conduct constituted an adverse employment action. *See Brenneman*, 507 F.3d at 1144 (holding that a constructive discharge required a tangible employment action); *Clegg*, 496 F.3d at 926 (listing constructive discharge as a type of adverse employment action). While Knapp asserts that her relationship with Ruser grew colder, even strained, after she raised the issue of pay inequality, the conduct she describes does not approach any semblance of adverse employment action. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (Title VII . . . does not set forth a general civility code for the American workplace.'" (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998))).

Knapp acknowledges that her strained relationship with Ruser did not interfere with her ability to perform her duties as they related to her assigned cases within the Civil Clinic. (*See* Filing No. 35-7 at 27:3–15.) As with her constructive discharge claim,

Knapp's unsupported assertion that Ruser's alleged neglect of his own cases somehow affected her duties and her cases in the Civil Clinic is threadbare, conclusory, and contradicted by the evidence in the record. On the evidence before the Court, no reasonable jury could conclude that Knapp suffered an adverse employment action, and therefore could not find in her favor on her claim of retaliation. For these reasons, her tenth claim will be dismissed.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment will be granted in part; her claims based on federal law will be dismissed; and her state-law claims will be remanded to the District Court of Lancaster County, Nebraska, for further proceedings.

IT IS ORDERED:

1. The Defendants' Motion for Summary Judgment (Filing No. 34) is granted in part, as follows:

   The Plaintiff's First, Second, Third, Sixth, Eighth, and Tenth Claims are dismissed with prejudice;

2. The Plaintiff's Fourth, Fifth, Seventh, and Ninth Claims are remanded to the District Court of Lancaster County, Nebraska, for further proceedings; and

3. Defendants' Motion in Limine (Filing No. 60) is denied as moot.

Dated this 10th day of November, 2015

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge
